## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**DAVID H. HUMPHREY**

    **Petitioner,**

    **vs.**                                **Civil Action No. 2:08cv99**
                                             **Criminal Action No. 2:04cr25**

**UNITED STATES OF AMERICA,**          **(Judge Maxwell)**

    **Respondent.**

## REPORT AND RECOMMENDATION

On September 24, 2008, petitioner, then *pro se,*[1] filed a Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody. (Dkt.# 57). An Attachment to the § 2255 motion was filed on September 25, 2008. (Dkt.# 60). Through counsel on November 12, 2008, petitioner filed a Motion for Extension of Time to File Amended § 2255 Motion or to Supplement Pending § 2255 Motion. (Dkt.# 66). That motion was granted by Order entered the same day. (Dkt.# 67). On May 12, 2009, the undersigned determined that summary dismissal of the petition was not warranted and the respondent was directed to file an answer. (Dkt.# 68). After its June 9, 2009 motion for an extension of time in which to respond (Dkt.# 70) was granted by Order entered September 21, 2009 (Dkt.# 76) , the United States filed its response on August 10, 2009. (Dkt.# 72). Petitioner, through counsel, filed a reply under seal[2] on September 14, 2009. (Dkt.# 73). This case is before the undersigned for a report and recommendation pursuant to Standing Order No. 4 and LR

---

[1]Petitioner's July 21, 2008 Motion for Appointment of Counsel for the Purpose of Handling his Petition Pursuant to 28 U.S.C. 2255 (Dkt.# 56) was granted by Order entered on October 2, 2008. (Dkt.# 61).

[2]Petitioner's September 16, 2009 Motion for Leave to File Under Seal and Incorporated Memorandum of Law (Dkt.# 74) was granted by Order entered on September 21, 2009 (Dkt.# 77).

PL P 83.01, *et seq.*

# I.  <u>Procedural History</u>

## A.  <u>Conviction and Sentence</u>

On October 10, 2004, petitioner was named by a federal grand jury in a two-count indictment with a forfeiture allegation.  (Dkt.# 1).  Specifically, the petitioner was named in both counts of the indictment alleging: Count 1 (felon in possession of firearms) from on or about May 7, 2004 to on or about the date of the indictment, in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2), and Count 2, (possession of firearm by unlawful user of controlled substance) from on or about May 7, 2004 to on or about the date of the indictment, in violation of 18 U.S.C. § 922(g)(3) and 924(a)(2).

On April 1, 2005, petitioner signed a plea agreement in which he agreed to plead guilty to Count 1 of the indictment.  (Dkt.# 20).  In the plea agreement, the petitioner waived any Sixth Amendment right he might have to a jury determination of any facts relevant to sentencing: Specifically, the agreement states:

> 13.  The defendant agrees that all sentencing facts and issues should be determined by the District Judge, and that factual issues relevant to the Guideline level should be determined by the District Judge using the preponderance of the evidence standard. To this end, the defendant waives any Sixth Amendment right he may have, if any, to a jury determination of any facts relevant to sentencing.

<u>Id</u>. at 4.

The petitioner did not waive his right to appeal or to collaterally attack his sentence under 28 U.S.C. § 2255.

On June 23, 2005, the petitioner, then aged 53 and possessing nine years of grade school education, entered his plea  in open court.  (Dkt.# 69, Plea transcript at 7).  Petitioner denied having had any alcohol or drugs, other than Motrin for back pain, within the previous twenty-four hours.

(Id.). He stated that he could read, write and understand the English language and denied any hearing or other impairment which would prevent his full participation in the hearing. (Id. at 8). He acknowledged having read the indictment with his attorney and indicated his understanding of the same. (Id.). During the plea hearing, the Government read aloud or summarized in open court each paragraph of the plea agreement, including Paragraph 13, *supra.* Petitioner's counsel advised the Court that prior to petitioner's signing the agreement, he and petitioner had reviewed the plea agreement carefully and he believed that petitioner had a clear understanding of it. (Id. at 16). The Court then reviewed all the rights petitioner was giving up by pleading guilty. (Id. at 14-15). During the plea hearing, the Government presented the testimony of William Berkeley Kcraget, special agent with the Bureau of Alcohol, Tobacco and Firearms, to establish a factual basis for the plea. (Id. at 22-33). Defense counsel conducted a lengthy cross-exam of the witness. The petitioner did not contest the factual basis of the plea.

After the Government presented the factual basis of the plea, the petitioner advised the Court that he was guilty of Count 1 of the indictment. (Id. at 22). The petitioner further stated under oath that no one had attempted to force, coerce, threaten or harass him into pleading guilty. (Id. at 33). In addition, he testified that the plea was not the result of any promises other than those contained in the plea agreement. (Id.). The petitioner testified that his attorney had adequately represented him, that he was "a good attorney" who, as far as he was aware of, had left nothing undone. (Id. at 23-24).

At the conclusion of the hearing, the Court determined that the plea was made freely and voluntarily, that the petitioner understood the consequences of pleading guilty, and that there was a basis in fact for the tendered guilty plea. (Id. at 34). The petitioner did not object to the Court's finding.

On September 11, 2006, the petitioner appeared before the Court for sentencing. After considering numerous factors, including the petitioner's reduced mental capacity; his ability to understand and control his behavior; his mental illness, isolated "hermit-like" lifestyle; history of substance abuse and avowed intention to refuse mental health treatment if permitted to return to his home, as he did not view his drug use as a problem; his "anti-establishment viewpoints," defiance of the law; as well as the seriousness of the offense; likelihood of further confrontations between petitioner and law enforcement; and the sentencing objectives of punishment, the Court stated that this was a "very rare case where the statutory maximum sentence of ten years is absolutely necessary to accomplish the goals of sentencing[.]" (Dkt.# 49 at 69 - 76). The Court went on to say that it shared defense counsel's dismay that petitioner would not receive credit toward his federal sentence for any of the time served in state custody, due to an error made by the W.Va. Dep't. of Corrections.[3] Accordingly, the Court applied petitioner's time already served in state custody to the federal sentence to be served, reducing it from 120 months to a term of 91 months. (Id. at 79 - 80), noting that "[w]hile 91-months term . . . undoubtedly seems extremely harsh to the Defendant, the Court would note that, under the best case scenario, the Defendant has the potential to reduce this sentence by approximately 12.6 months if he behaves and earn the maximum good time credit of 54 days per days [sic]." (Id. at 80). Petitioner was also given a three-year term of supervised release to follow his release from imprisonment.

**B.      Appeal**

Petitioner, through counsel, filed a notice of appeal to the Fourth Circuit Court of Appeals

---

[3] Once petitioner's one-year state sentence was completed, the Tygart Valley Regional Jail failed to send a release to the U.S. Marshal's service, transferring petitioner's custody to the government. As a result, by the time he was sentenced on the instant federal charges, petitioner had been incarcerated for 29 months, first on the one-year wanton endangerment charge and then in error because of the local jail's inadvertence, with none of it entitled to be credited to his federal sentence. U.S. v. Humphrey, No. 06-4995 at 8 (4th Cir. Apr. 15, 2008) (per curiam).

on September 20, 2006.  (Dkt.# 46).  As the only ground for his appeal, petitioner challenged the upward variance of his 91-month sentence, arguing that the District Court misapplied or failed to consider the statutory factors under 18 U.S.C. § 3553(a), such that the extent of the variance was excessive under the case facts, resulting in an unreasonable sentence.

On April 15, 2008, in an unpublished *per curiam* opinion, the Fourth Circuit Court of Appeals affirmed petitioner's sentence.  (Dkt.# 52).  Mandate issued on May 7, 2008.  Petitioner did not file a petition for writ of certiorari with the United States Supreme Court.

**C.**   **Federal Habeas Corpus**

**Petitioners' Contentions (Dkt.# 57 and 60)**

In his *pro se* federal habeas petition the petitioner raises four issues for relief including:

**(1)** Petitioner's guilty plea was not knowing, intelligent and voluntary because his mental illness, cognitive deficits, learning problems and lack of education rendered him incapable of fully appreciating the consequences of his plea.  Further, he could not foresee that the sentence he ultimately received would be almost double the lowest end of the guideline range, based on the results of the forensic evaluation by the Bureau of Prisons (BOP) that he was required to participate in without the presence of counsel, since that evaluation was not ordered until after he had already entered his plea.  Petitioner could not have known that the forensic evaluation would be used against him to support an extreme upward variance in sentencing.  Had he known that he would be ordered to participate in the BOP forensic exam; that it would be done outside the presence of counsel; and that would be used against him to arrive at a much greater sentence than expected, he would he would have proceeded to trial, rather than enter a guilty plea;

**(2)** The Government, through law enforcement officers' actions, committed outrageous conduct that rose to the level of a <u>Brady</u>[4] violation, by knowingly suppressing evidence exculpatory to petitioner's criminal responsibility and supportive to his potential defense of legal insanity, when it failed to disclose video footage of law enforcement officers making vulgar, disparaging references regarding petitioner's mental status immediately after his arrest.  Instead of providing a complete videotape of the incident, law enforcement provided an edited videotape to petitioner's defense counsel and the federal prosecutor that omitted this key portion of the events;

**(3)** Petitioner's conviction as a felon in possession of firearms was obtained in violation of his Second Amendment right to possess rifles and shotguns for hunting and for protection while living

_____

[4]<u>Brady v. Maryland</u>, 373 U.S. 83, 83 S.Ct. 1194, 10 L. Ed. 2d 215 (1963).

alone in an isolated rural area; further, petitioner did not believe he was prohibited from possessing firearms; and

**(4)** Petitioner's 91-month sentence constitutes cruel and unusual punishment, in violation of the Eighth Amendment, given that petitioner has been deprived of mental health treatment while incarcerated.

Petitioner, although not alleging ineffective assistance of counsel, asserts that none of the present grounds for relief were raised previously because they were not known at an earlier time or were not presented by counsel.

## Government's Response (Dkt.# 72)

In its response, the government answers the petitioner's claims as follows:

**(1)** Petitioner's claim that his guilty plea was not knowing, intelligent and voluntary is procedurally defaulted as he could have, but did not raise it on appeal; nor can he show cause for failing to do so. Further, the record reflects that petitioner' plea hearing Rule 11 colloquy demonstrated that petitioner's plea was knowing, voluntary and intelligent.

**(2)** The Government concedes that it did not disclose the police in-car camera video footage of a police officer "who did not witness the event" calling petitioner 'nuts," that was made immediately after the incident and arrest occurred. However, the Government contends that this non-disclosure is irrelevant and does not constitute <u>Brady</u> material.

**(3)** Petitioner's claim that his Second Amendment right to possess hunting firearms was violated by the unconstitutional application of Title 18, U.S.C. § 922(g)(1) should be dismissed as petitioner cannot show cause for failing to raise the issue on direct appeal. Petitioner's claim that he was unaware that he was prohibited from possessing firearms after his 1986 felony conviction is irrelevant, as ignorance of the law is not a defense; moreover, the case petitioner cites in support of his argument specifically says that the right to bear arms is not unlimited and felons are prohibited from possessing them. Further, petitioner's argument that the firearms were used for hunting and protection is no defense.

**(4)** Petitioner's claim that his 91-month sentence is cruel and unusual punishment under the Eighth Amendment because he has been deprived of mental health treatment while incarcerated should be dismissed as it is a claim best raised in a § 1983 action, rather than as a challenge to a sentence under 28 U.S.C. § 2255, since it is a challenge on how the sentence is being carried out by the Bureau of Prisons, rather than a challenge to the sentence itself.

## Petitioner's Reply (Dkt.# 73)

In his reply, now through counsel for the first time,[5] the petitioner expands on the issues raised

in his original petition, as follows:

**(1)** Petitioner requests an evidentiary hearing to present testimony and evidence in support of his § 2255 petition, including the issues relative to his plea, the issue of procedural default, and presentation of the videotape that forms the basis for the <u>Brady v. Maryland</u> violation alleged in Ground 2.

**(2) Supplementing Original Issue (2):** The previously-undisclosed video shows law enforcement officers belittling petitioner, making vulgar, disparaging remarks about him and repeatedly calling him "nuts" immediately after the incident. It demonstrates that the officers were clearly aware of petitioner's mental illness. The contents of the tape are relevant to the defense of legal insanity and could have been used in his defense had the tape been disclosed prior to petitioner's plea, as it was exculpatory <u>Brady</u> material and tended to prove malicious selective prosecution or general bias on the part of law enforcement. Petitioner's concerns regarding deliberate harassment by local law enforcement are well-documented in the record. The withheld video would have given evidentiary support to petitioner's continued claims of police harassment, which hitherto had been fully or partially dismissed as mere paranoia, delusion or exaggeration. Further, had the withheld video been disclosed prior to the plea hearing, it would have provided ample fodder for impeachment during the police officers' cross-examination.

**(3) Supplementing Original Issue (1):** Petitioner's plea was not knowing, intelligent or voluntary, because at the time he entered his plea, he could not have foreseen the 91-month sentence he received, since it was based in large part upon "information extracted by the Court from the [Butner Evaluation] generated after the Rule 11 hearing[.]" (Dkt.# 73 at 7). Petitioner could not have anticipated that the Court would order a determination of mental competency pursuant to 18 U.S.C. § 4241 and then enhance his sentence beyond what might otherwise have been expected under the sentencing guidelines or plea agreement based upon the report of that evaluation, since the language of § 4241 does not impact upon the sentencing process in any way. Despite the apparently conventional Rule 11 colloquy and petitioner's sworn statements to the Court, petitioner asserts that due to the novelty of what occurred, his § 2255 claims regarding the validity of his plea do not contradict his plea hearing statements to the Court. Petitioner renews his request for an evidentiary hearing to show the error that occurred and the miscarriage of justice that will result if his § 2255 motion is not granted.

**(4) Supplementing Original Issue (4):** Petitioner reiterates his allegation that his 91-month sentence constitutes cruel and unusual punishment, because the Bureau of Prisons ("BOP") has all but ignored petitioner's fragile mental condition and the Court's recommendation in its judgment order that petitioner receive appropriate mental health monitoring. The Butner Forensic Evaluation

---

[5]Petitioner's appellate counsel's Motion for Appointment of Counsel for the Purpose of Handling his Petition Pursuant to 28 U.S.C. § 2255, although filed two months before petitioner's *pro se* § 2255 was filed, was not granted until October 2, 2008.

detailing petitioner's psychological diagnosis, history and supporting data was forwarded to the BOP along with the Presentence Report. The Court's judgment expressly recommended that petitioner serve his term of imprisonment at the Federal Medical Center at Butner, North Carolina, because that facility had already conducted the psychiatric examination of petitioner, was familiar with petitioner and he was familiar with it. Petitioner has never been sent to a federal medical facility and "has received virtually no mental health treatment while in the BOP." (Id. at 9).

## III. <u>Analysis</u>

### A. <u>Burden of Proof</u>

"A petitioner collaterally attacking his sentence or conviction bears the burden of proving that his sentence or conviction was imposed in violation of the Constitution or laws of the United States, that the court was without jurisdiction to impose such a sentence, that the sentence exceeded the maximum authorized by law, or that the sentence otherwise is subject to collateral attack. 28 U.S.C. § 2255. A motion collaterally attacking a petitioner's sentence brought pursuant to § 2255 requires the petitioner to establish his grounds by a preponderance of the evidence." <u>Sutton v. United States of America</u>, 2006 WL 36859 *2 (E.D.Va Jan. 4, 2006).

### B. <u>Barred Claims</u>

Before evaluating the merits of petitioner's claims, the Court must determine which of his issues he may bring in his § 2255 motion and which are barred either because they are not appropriately raised in a § 2255 motion or because petitioner's failure to raise them on direct appeal is not excused.

It is well settled that issues previously rejected on direct appeal may not be raised in a collateral attack. <u>Boeckenhaupt v. United States</u>, 537 F.2d 1182, 1183 (4th Cir. 1976). <u>See also Herman v. United States</u>, 227 F.2d 332 (4th Cir. 1955). Constitutional errors that were capable of being raised on direct appeal but were not may be raised in a § 2255 motion so long as the petitioner demonstrates 1) "cause" that excuses his procedural default, and 2) "actual prejudice" resulting from

the alleged error.  <u>United States v. Maybeck</u>, 23 F.3d 888, 891 (4th Cir. 1994).  Claims of ineffective

assistance of counsel not raised on direct appeal and raised on collateral attack do not require a "cause

and prejudice" showing because these claims are more appropriately raised on collateral attack than

on direct appeal.  <u>See</u> <u>United States v. Richardson</u>, 195 F.3d 192 (4th Cir. 1999), cert. denied, 528 U.S.

1096 (2000); <u>White v. United States</u>, 2006 U.S. Dist. LEXIS 45122, at *7-8 (S.D. W.Va. June 20,

2006).

  Here,  Petitioner's Ground Three claims  that 1) his conviction was obtained in violation of

his Second Amendment right to bear firearms for hunting and  protection while living alone in an

isolated rural area, and 2) that he did not realize he could not possess firearms, are both procedurally

barred because he could have, but did not raise them on appeal.

  Petitioner cites the recent decision in  <u>District of Columbia v. Heller</u>, 128 S.Ct. 2783; 171

L.Ed. 2d 637 (2008) (striking down the District of Columbia's ban on handgun possession in the

home as a violation of Second Amendment), as  the "cause" to excuse his procedural default for not

previously raising his first Ground Three claim on direct appeal.  Petitioner's contention that the "U.S.

Supreme Court decided the issue after his appeal was decided" lacks merit.   Even the most cursory

read of <u>D.C. v. Heller</u> reveals that the case categorically refutes petitioner's reliance on it. "Like most

rights, the right secured by the <u>Second Amendment</u> is not unlimited . . . nothing in our opinion [today]

should be taken to cast doubt on the longstanding prohibitions on the possession of firearms by felons

and the mentally ill[.]"  <u>D.C. v. Heller</u> at 2816 - 2817.  Accordingly, petitioner can demonstrate

neither cause nor actual prejudice from the alleged error and this claim should be denied.

  Petitioner's next Ground Three claim, that he did not realize that he was prohibited from

possessing firearms after his prior felony conviction, lacks merit.  As the Government pointed out in

its response, "ignorance of the illegality of one's possession of weapons . . . is not a defense,

incomplete or otherwise, to charges under [Title 18 U.S.C., Section] 922(g)(1)." U.S. v. Blackburn, 1992 U.S. App. LEXIS 5359 (slip op. at 5); 958 F.2d 369 (4th Cir. 1992). Petitioner has failed to assert any "cause" to explain his failure to raise this issue on direct appeal and has not even alleged, let alone demonstrated, actual prejudice. This claim must be denied.

## C. Claims Not Cognizable in a § 2255 Motion.

Petitioner's next claim, raised in Ground Four, is that his 91-month sentence violates the 8th Amendment's prohibition against cruel and unusual punishment, because he is mentally ill and has not received the intensive mental health treatment expressly recommended by this Court's Judgment Order. Petitioner alleges that his fragile mental state has worsened as a result of the Bureau of Prisons' ("BOP") deliberate indifference to his serious mental health needs. Petitioner asserts that he has received virtually no mental health treatment from the BOP from the time he was first incarcerated to the present. Further, when his mental problems cause him to act out, he is sent to the Special Housing Unit ("SHU") as a disciplinary measure, instead of receiving counseling and treatment.

A habeas corpus petition is an attack by a person in custody upon the legality of that custody. The petitioner is not entitled to any relief on this claim under § 2255 because he is not challenging the legality of his custody. In this claim, petitioner makes no challenge to his sentence or conviction. Rather, he is challenging the conditions of his confinement - - a civil rights violation, which is not a claim that can be brought in a habeas corpus petition. See Preiser v. Rodriguez, 411 U.S. 475, 499 - 500 (federal habeas relief extends to prisoners challenging the fact or duration of imprisonment and § 1983 actions apply to inmates making constitutional challenges to conditions of confinement). See also Lee v. Winston, 717 F.2d 888 (4th Cir. 1983). To pursue his claim of civil rights violation, petitioner must file a lawsuit governed by Bivens v. Six Unknown Agents of the

Federal Bureau of Narcotics,[6] 403 U.S. 399 (1971), and pay the $350.00 filing fee.[7]

**D.**     **Ground One**:  **Whether Petitioner's Plea was Knowing, Intelligent and Voluntary**

Petitioner contends that his plea was not knowing, intelligent and voluntary, because at the time that he executed his plea agreement, he anticipated receiving a sentence of approximately 37 months.  Petitioner points out that his PreSentence Investigation Report ("PSR") determined an applicable sentence guideline range of 46 - 57 months, and at sentencing, even the government recommended a 46-month sentence, while defense counsel argued for a downward variance based on numerous mitigating factors.[8]   However, the Court rejected both recommendations, departing from the guideline recommendation with an extreme upward departure, imposing a 91-month sentence,[9] almost double the low end of the guideline range.  Petitioner argues that the greatly-enhanced sentence was, in large part, based on information from a Federal B.O.P. Forensic Evaluation Report generated after the Rule 11 hearing.  Petitioner states that at the time he signed the plea agreement,   he did not know that this evaluation would be performed, nor could he have known that it would have been used against him to warrant such an extreme upward sentencing variance.  Further, petitioner asserts, that

---

[6] In Bivens, the Supreme Court created a counterpart to § 1983, so that individuals may bring suit against a federal actor for violating a right guaranteed by the Constitution or federal law.  Because petitioner is a federal prisoner, he must therefore file a Bivens action as opposed to one under § 1983.

[7] Undoubtedly, petitioner is without funds to pay such a fee.  However, if he wishes to pursue this option, he can still proceed by filing an application for permission to proceed *in forma pauperis* ("IFP").  If granted, he will be permitted to pay an initial partial filing fee and then make subsequent partial payments until the fee is paid in full. 28 U.S.C. § 1915 (b)(1)(1996).

[8] The mitigating factors included petitioner's health problems; his diminished mental capacity; his long and well-documented history of mental illness; the overstatement of his relatively minor criminal offense history; and his good character and heroic acts in the past.

[9] Petitioner would have received the statutory maximum sentence allowed, 10 years or 120 months sentence, but the Court reduced that to 91 months, granting petitioner credit for the time served in state custody, twenty-nine months on a twelve-month sentence, due to the state's failure to release him to federal custody after his state court sentence was completed.

had he "any idea that his sentence would result in 91 months of incarceration, then he would have proceeded to trial." (Dkt.#60 at 1).

A defendant has intelligently entered a guilty plea when he is "advised by competent counsel, . . . made aware of the nature of the charge against him, and there was nothing to indicate that he was incompetent or otherwise not in control of his mental faculties." Brady v. U.S., 397 U.S. 742, 756, 90 S. Ct. 1463, 25 L. Ed. 2d 747 (1970).. A guilty plea is voluntary if "'entered by one fully aware of the direct consequences'" of the plea. Id. at 755.

In this case, the record reveals that the district court conducted a very thorough Rule 11 hearing, insuring that petitioner understood all the rights he would forego by pleading guilty; the elements of the charge to which he was pleading; the potential penalties he faced; the effect of supervised release; and the impact of the Sentencing Guidelines. The court ascertained that petitioner's plea was voluntary and that a factual basis existed for it. During the hearing, this exchange was had:

THE COURT: Also, do you understand that the - - do you understand the consequence of a plea of guilty?

THE DEFENDANT: Yes, sir, I do.

THE COURT: Mr. Walker, do you believe that Mr. Humphrey, the Defendant, understands the consequences of a plea of guilty?

MR. WALKER: Yes, sir, I do.

THE COURT: All right. Have you had an opportunity, Mr. Walker, to go over all of this matter with your client, Mr. Humphrey?

MR. WALKER: Absolutely, Your Honor . . . We went over the plea agreement, he clearly understood it, he executed it in my presence and with the benefit of my advice, so I think he is prepared to go forward today, Your Honor, in a knowing, voluntary and intelligent way.

THE COURT: All right, fine.

Plea hearing transcript, Dkt.# 69 at 15 -16.

Further, petitioner clearly understood that the sentence he received might be greater than what he hoped for:

THE COURT: Has your attorney explained to you the various considerations which apply in determining what the sentence in your case may be under the guidelines and the applicable statutes?

THE DEFENDANT: Yes, sir, he did.

THE COURT: Do you understand that you cannot, in any event, receive a greater sentence than the statutory maximum earlier explained?

THE DEFENDANT: Yes, sir.

THE COURT: Also, do you understand that the Court will not be able to determine the guideline sentence in your case until a later date, when a presentence report has been completed and both you and the Government have had an opportunity to challenge the facts reported and relied upon by the probation officer?

THE DEFENDANT: Yes, sir.

THE COURT: Also, do you understand that the sentencing - - under the sentencing guidelines, there is a concept known as relevant conduct, whereby the Court, in determining the total offense level under the sentencing guidelines, takes into account conduct, circumstances, and injuries relevant to the crime or crimes that you are convicted of?

THE DEFENDANT: Yes, sir.

THE COURT: Do you also understand that, after the Court has determined what guidelines apply to your case, the court has the authority in some circumstances to depart from the guidelines and to impose a sentence that is either more severe or less severe than the sentence called for by the guidelines, and the Court may, now, after considering the guidelines, disregard them . . . and sentence you to a sentence within the applicable statutory range if the Court can find just cause to do so?
THE DEFENDANT: Yes, sir.  Thank you.
. . .

THE COURT: Do you understand that if the Court accepts your plea of guilty and the sentence ultimately imposed on you is more severe than you expect, you would still be bound by your guilty plea and you would have no right to withdraw it?

THE DEFENDANT: Yes.  Yes, sir.

THE COURT: Do you understand, Mr. Humphrey, that the Court is not bound by any of the nonbinding recommendations contained and set forth in your plea agreement, and if the Court does not accept the nonbinding recommendations or any of them, you would still be bound by your guilty plea and you would have no right to withdraw it?

THE DEFENDANT: Yes, sir.

Id. at 18 - 21.

Petitioner's contention that his plea was not knowing, intelligent and voluntary because he could not anticipate that he would receive the maximum sentence lacks merit. Petitioner was fully apprised that his sentence might be higher than he expected, but entered his plea anyway. Further, as the Government pointed out in its response, this claim is procedurally defaulted as petitioner could have, but did not raise it on appeal; nor has he shown cause for failing to do so.

Petitioner also contends that his mental illness, cognitive defects, learning problems and limited education rendered him incapable of fully appreciating the consequences of a guilty plea. Whether a defendant is competent is a question of fact. Daughtry v. Polk, No. 04-1, 190 Fed. Appx. 262, 2006 U.S. App. LEXIS 17962, (4th Cir. 2006) (unpublished opinion).

In this case, after the Court indicated it was considering an upward departure from the sentencing guidelines, defense counsel obtained a forensic psychological exam for petitioner. That examiner testified as to his findings at petitioner's sentencing hearing in an attempt to persuade the Court that such a departure was not warranted and that in fact, a downward departure under § 5K2.13 might be more appropriate. The examiner, William Fremouw, Ph.D., A.B.P.P., opined that petitioner "clearly suffers from a "significantly reduced mental capacity," that reduced or diminished his capacity to "understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason." (Dkt.# 43 at 24). Thereafter, the Court ordered a forensic psychiatric exam be performed on petitioner through the Bureau of Prisons ("B.O.P."), to determine whether he was

"suffering from a mental disease or defect for which he is in need of custody for care of treatment . . . and [whether he] might have been suffering from such a mental disease or defect at the time of the commission of the alleged offense, as well as at the time of the entry of his guilty plea." (Dkt.# 25 at 1).

The B.O.P. defense forensic assessment and the B.O.P's Forensic Evaluation, performed six months later, both conclude that petitioner suffers from Major Depressive Disorder, Cannabis dependence, and Schizotypal Personality Disorder. The B.O.P. opined that petitioner had "several factors play[ing] . . .a role in . . . [his] having less capacity than usual to understand and control his conduct . . . chronic impulsivity problems, poor frustration tolerance, perception of harassment, perceptions of entitlement, difficulty regulating his affect, and poor judgement related to depression, appear to have significantly reduced this ability." Dkt.# 29 at 32 - 33. Despite this, the B.O.P. evaluators concluded that "at the time of the commission of the instant offense . . . [petitioner] was not suffering from a mental disease or defect such that he did not have the mental capacity to understand and control his conduct." Dkt.# 29 at 34.

U.S.S.G. §5K2.13 provides as follows:

A sentence below the applicable guideline range may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense. Similarly, if a departure is warranted under this policy statement, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.

However, the court may not depart below the applicable guideline range if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public; or (4) the defendant has been convicted of an offense under chapter 71, 109A, 110, or 117, of title 18, United States Code.

Emotional problems do not justify a departure under §5K2.13.  United States v. Withers, 100

F. 3d 1142, 1147-48 (4th Cir. 1996).   Further, a defendant must show that his "significantly reduced

mental capacity bears a causal relationship to the crime, i.e., she must show an inability  "to process

information or to reason."  Id.

In the instant case, despite his  multiplicity of problems, there is no evidence that the petitioner

was unable to process information or reason.  Although the petitioner's § 2255 motion and reply, and

the extensive record document a long history of obstacles and difficulties in his life,[10]  cited by

---

[10] Petitioner has approximately 9 years of grade school education.  He grew up on a farm in Tucker County, and has lived in or near Parsons WV nearly all his life. He was the youngest of four, the son of an alcoholic father who had little, if any formal education.  The record is replete with reports indicating that he was singled out and mercilessly tormented, both at home and school, his entire life.  In the PSR, his mother reported that Humphrey's 3 elder half-siblings picked on him merely for being the child of their father's second wife. Further, the records indicate that "[f]or most of his adult life he has lived alone and has had few friends.  Much to my dismay, when I was first appointed to represent him, he was referred to as "Shitty Boots" by the local probation officer.  I was appalled and then found out that this name had been attributed to this man since he was a small boy . . .[when he] had an episode of diarrhea in school and his fellow classmates gave him this horrible label and it has stuck with him his whole life. I have heard both police officers and magistrates refer to him by that name more times than I prefer to stomach." May 17, 2005 Letter from John W. Cooper, Esq. to U.S. District Judge Robert E. Maxwell,  Dkt.# 43, Exh. C at 26.  ". . . I believe he is a good-hearted individual who is capable of selfless, heroic action where others (like me) would back away.  Humphrey's excentricities [sic] have led him into social difficulty in Parsons, where he is the brunt of cruel jokes and bullying..."  May 13 [2005] Letter from Michael Kline to U.S. District Judge Robert E. Maxwell, Dkt.# 43, Exh. C at 31. Petitioner's estimated Full-Scale IQ score is 84, within the low average range of functioning, per the U.S. Dep't. of Justice B.O.P. Psychiatric Evaluation ("Butner Evaluation"),  Dkt.# 29 at 19. The Butner evaluation also noted low scores in other areas; for instance, his "performance on a measure of mental tracking and control was Impaired (2nd percentile) . . . characterized by both slow processing as well as unusual difficulties with mental tracking such as being unable to successfully recite the alphabet."  See Id. at 20.  Petitioner has a long history of mental and emotional problems, was hospitalized at least four times in Sharpe Hospital, Weston WV between 1999 - 2000, and was referred for community mental health treatment at various times.  Over the years, he was diagnosed variously with Impulse Control Disorder, Major Depression, Cannabis Dependence, Psychotic Disorder NOS (NOS = not otherwise specified), Poly Substance Dependence.  Twice he was diagnosed (once by Sharpe and once by Appalachian Community Mental Health) as having an Anti-Social Personality, but repeated evaluations by each institution failed to make that diagnosis and it was apparently abandoned. His present "schizotypal personality disorder" diagnosis was explained by Wm. Fremouw Ph.D., A.B.P.P. as ". . . the shorthand version of it, the person's odd.  Odd in behavior, odd in appearance, odd in thinking.  They are not psychotic, they are not out of touch with reality as a schizophrenic is, but just short of schizophrenia.  And it's captured by this hermit lifestyle that he lives, but he chooses to live in the oddity of appearance that he has - he has cultivated . . . you also have some paranoid beliefs, in that he believes that the . . . local police were after him." Dkt.# 49 at 25 - 26.  Each time he was  hospitalized, he was treated with psychotropic medications.  However, due to his marginal income, general destitution and lack of health insurance, he could not afford the prescriptions once discharged and instead, apparently self-medicated with marijuana to control his symptoms, saying "it makes me mellow and reduces depression and sleeplessness."  Fremouw Pre-Sentencing Forensic Assessment, Dkt.# 43 at 18.  The forensic mental examination performed by the B.O.P. ("Butner exam") indicated that Humphrey's neurological assessment viewed him as "likely being at an early stage of dementia due to multiple etiologies, including previous head injuries chronic

petitioner in his argument for a downward departure, the Seventh Circuit has rejected such a step in

United States v. Pullen, 89 F.3d 368 (7th Cir.1996). The Fourth Circuit summarized the Pullen, case

as follows:

> the defendant pointed to a childhood and adolescent history of sexual and physical abuse by his father as a reason for applying the "diminished capacity" departure. Despite the fact that a psychologist testified that the defendant suffered from a "schizoid disorder" that impaired "his ability to think and act clearly" the district court refused to apply the departure. Id. at 369-70. The Seventh Circuit affirmed, noting that "[i]f a miserable family history were in an average case a permissible basis for leniency ... this would resurrect the pre-guidelines regime of discretionary sentencing." Id. at 371. To set such a low threshold for diminished capacity departures would create incentives for defendants to comb their personal circumstances in order to find evidence of hardship and misfortune. This search, we suspect, would almost always be fruitful given that adversity in its infinite variety comes with the journey of life.

Withers, 100 F.3d at 148.

Thus, the difficulties and hardships petitioner has faced in his life, although substantial, did

not justify granting a departure under U.S.S.G. §5K2.13 because there was nothing that revealed

he was unable to process information or reason. Furthermore, at his plea hearing, his own attorney

stated to the Court that he "clearly understood [the guilty plea], he executed it in my presence and

with the benefit of my advice, so I think he is prepared to go forward today . . . in a knowing,

voluntary and intelligent way." Dkt.# 69 at 15 - 16.

Petitioner's plea, obtained in a properly-conducted Rule 11 hearing, was knowing,

intelligent and voluntary. This claim has no merit and should be denied.

**E.** **Ground Two: Whether law enforcement's outrageous conduct in suppressing the exculpatory evidence in the previously-undisclosed videotape constituted a Brady violation, such that petitioner's due process rights were violated.**

Petitioner contends that members of law enforcement, including members of the West

---

depression, behavior difficulties, probable learning disability, and chronic substance abuse." Dkt.# 29 at 12. .

Virginia State Police, knowingly suppressed material, relevant exculpatory evidence which would have lent support to petitioner's claims of diminished criminal responsibility; malicious, selective or vindictive prosecution; a general bias toward him on the part of local law enforcement. Further, he claims, the potential defense of legal insanity would have been meaningfully explored and possibly asserted had the existence of the other tape been disclosed earlier. Petitioner asserts that the "most prominent aspect of the government's case" against him was a videotape generated by the West Virginia State Police's in-car video camera of the May 7, 2004 gun brandishing offense that prompted his arrest. In the memorandum attachment to his pro se motion to vacate, petitioner states:

> The video showed the Petitioner in clear distress and brandishing a long gun after an encounter with a trooper who laid in wait for the Petitioner to descend the dirt road leading to his remote home so the trooper could issue traffic tickets. The first copy of the video footage provided to the federal prosecutor and the Petitioner omitted what transpired *immediately after* the incident. A second copy of the video obtained by the Petitioner after sentencing . . . revealed that law enforcement officers were clearly aware of the Petitioner's mental illness . . .[as the] officers made vulgar and disparaging remarks about the Petitioner and twice referred to him as "nuts."

(Dkt.# 60 at 2).

Petitioner entered his plea on June 23, 2005 and was sentenced on September 11, 2006. He filed a timely appeal with the Fourth Circuit. It was not until after October 30, 2007, over ten months after his appellate brief had been filed and after the case had already been calendared for oral argument, that the existence of the "unedited" copy of the tape was revealed. The discovery occurred by happenstance, when the federal public defender, who served as both petitioner's trial and appellate counsel, requested a duplicate copy of the tape in preparation for oral argument

before the Fourth Circuit Court of Appeals,[11] because petitioner's original copy had broken.  Upon

receiving the new tape, he discovered that it was different than that which had been previously

provided.

On July 21, 2008, petitioner's appellate counsel[12] filed a motion on his behalf, requesting

that counsel be appointed to bring a § 2255 petition for petitioner. (Dkt.# 56).[13]  In it,  appellate

counsel explained the inadvertent discovery of the second, unedited version of police videotape,

opining that it was his understanding that the federal prosecutor's office staff

> obtained the second copy [of the videotape] directly from law enforcement and then
> forwarded the second copy on to the Defendant.  It is therefore, the belief of
> undersigned counsel that the exculpatory information on the second copy of the tape
> was never originally provided to the federal prosecutor prior to trial [sic].  The
> officers in this case are experienced enough to know that had they turned the
> exculpatory footage over to the federal prosecutor prior to trial [sic], then it would
> have been disclosed in discovery and it would have benefitted the Defendant.  The
> Defendant contends that this is precisely what the officers intended to undermine by
> suppressing the video.

(Dkt.# 56, n.2 at 5).

The suppression by the prosecution of evidence favorable to an accused is itself sufficient

to amount to a denial of due process.  Brady v. Maryland, 373 U.S. 83, 86; 83 S. Ct. 1194; 10 L. Ed.

2d 215 (1963).  Such suppression of evidence violates due process where the evidence is material

---

[11] Petitioner's appeal was ultimately unsuccessful; the District Court's sentence was affirmed on April 15, 2008;  mandate issued on May 7, 2008.

[12] Appellate counsel had also represented petitioner pre-plea.

[13] Counsel argued that petitioner would be completely incapable of identifying or advancing his 28 U.S.C. § 2255 claims  *pro se*, due to his poverty, incarceration, lack of education, intellectual limitations and mental illness. He pointed out that petitioner was destitute, unsophisticated, had received little education and had always had academic problems as a child.  Further, he explained, the BOP's February 22, 2006 Forensic Evaluation Report clearly documented petitioner's cognitive weaknesses as having components of learning ability, general knowledge and verbal fluency in the "impaired" and "borderline impaired ranges," giving him at best, a low average range of function, in addition to his diagnosis of  Major Depressive Disorder and Schizotypal Personality Disorder.   Counsel explained that petitioner was unsophisticated and lacked the understanding of the law and procedure.  The motion for appointment of counsel to bring the § 2255 motion on petitioner's behalf was granted on October 8, 2008.

to either guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. Brady at 87. Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability' is a probability sufficient to undermine confidence in the outcome. U.S. v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481, 1985 U.S. LEXIS 130 (1985). *See also* Kyles v. Whitley, 514 U.S. 419, 433-434, 131 L. Ed. 2d 490, 115 S. Ct. 1555 (1995).

Pursuant to the Supreme Court's decision in Brady, due process requires that a prosecutor disclose material in the Government's possession that is favorable to an accused. The remedy for a Brady violation does not . . . normally require the exclusion of a witness' testimony. Instead, a Brady violation usually entitles a defendant to a new trial. Monroe v. Angelone, 323 F.3d 286, 293, 2003 U.S. App. LEXIS (4th Cir. 2003) *quoting* Spicer v. Roxbury Corr. Inst., 194 F.3d 547, 562 (4th Cir 1999).

Acknowledging that the Brady rule encompasses evidence 'known only to police investigators and not to the prosecutor," Kyles *supra* at 438, the Supreme Court stated that in order to comply with Brady, the prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police. Id. at 437, quoted in Strickler v. U.S., 527 U.S. 263, 280 – 281, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). However, the Brady right is a trial right,[14] and here, petitioner pled guilty. The firmly established rule in

---

[14] Brady exists to preserve the fairness of a trial verdict and to minimize the chance that an innocent person would be found guilty. *See* Brady, 373 U.S. at 87, *quoted in* United States v. Ruiz, 536 U.S. 622, 628, 122 S. Ct. 2450, 153 L. Ed. 2d 586 (2002) (noting that Brady rights are provided as part of the Constitution's "'fair trial' guarantee"); Id. at 634 . The rationale for Brady was 'avoidance of an unfair trial to the accused.'" Brady, 373 U.S. at 87. Courts have held that "when a defendant pleads guilty, those concerns are almost completely eliminated because his guilt is admitted. *See* Menna v. New York, 423 U.S. 61, 62 n.2, 96 S. Ct. 241, 46 L.Ed. 2d 195 (1965) (per curiam) (explaining that a defendant's admission of guilt in a guilty plea is "so reliable that, where voluntary and intelligent, it quite validly removes the issue of factual guilt from the case") (emphasis added); Matthew v. Johnson, 201 F.3d 353, 361 (5th Cir. 2000) (explaining that "[t]he Brady rule's focus on protecting the integrity of trials suggests that where no trial is to occur, there may be no constitutional violation"); Orman v. Cain, 228 F.3d 616, 617

almost every jurisdiction is that a voluntary, counseled guilty plea cures all defects except for lack of jurisdiction. Despite that, the Fourth Circuit Court of Appeals has held that "[b]ad faith manipulation of evidence on the part of the police cannot be countenanced. Constitutional absolution of the concealment, doctoring, or destruction of evidence would fail to protect the innocent, fail to assist the apprehension of the guilty, and fail to safeguard the judicial process as one ultimately committed to the ascertainment of the truth." Jean v. Collins, 221 F.3d 656, 663 (4th Cir. 2000).

To investigate this serious allegation, the undersigned requested, obtained a copy of both videotapes from petitioner's counsel[15] for review. The only difference between the two videotapes is that one version is approximately three minutes shorter than the other, having had footage at the end removed. However, the missing footage contained nothing substantive. Apparently, after the incident but before the arrest, unaware that the in-car camera was still running, the officer inadvertently filmed his own travel route into town to obtain warrants.

Neither version of the videotape shows the petitioner being belittled or harassed by the officers. Both versions show the scene of the original confrontation on the highway as petitioner emerged from his driveway in the woods and the officer attempted to get him to stop; petitioner's refusal to stop; his flight back up his driveway into the woods; the officer's chase with siren blaring; the stand-off at petitioner's trailer with petitioner's "suicide-by-cop" and homicidal threats; the officer's repeated orders to lay his weapon down; the officer's eventual backing out of petitioner's

_____

(5th Cir. 2000) ("Brady requires a prosecutor to disclose exculpatory evidence for purposes of ensuring a fair trial, a concern that is absent when a defendant waives trial and pleads guilty."). U.S. v. Zacarias Moussaoui, 591 F.3d 263, 285, 2010 U.S. App. LEXIS 43 (2010).

[15] Counsel had the original damaged videotape repaired and copies made of it and of the newly-discovered, purportedly unedited version for the Court, the AUSA and all counsel.

driveway and petitioner following later, at some distance, in his own truck; and then the officer pulling out onto "the main road," parking there, waiting for backup.

Both tapes show the other officers who eventually arrived as backup, gathering to wait on the main road prior to petitioner's arrest. Although the footage is grainy and the sound quality poor, it is clear that while standing around waiting, several officers did make casual derogatory remarks about the petitioner, who was apparently well-known to them. All of this happened after the officer's original confrontation with petitioner, but well before the newly-arrived officers went back into the woods to arrest petitioner. The arrest itself was not on either videotape. Petitioner was not present when any of the remarks were made. There is no indication or evidence that anything relevant or substantive was redacted from the videotape, as they are identical in every respect, except for the inadvertent capture of footage of country roads en route to town at the end, on the one. There was no intentional redaction of exculpatory evidence, nor was there was a <u>Brady</u> violation. This claim has no merit and should be denied.

### III.  <u>Recommendation</u>

For the reasons stated above, the undersigned recommends that the petitioner's §2255 motion Grounds One, Two and Three be **DENIED and DISMISSED with prejudice** from the docket and that petitioner's civil rights claim as stated in Ground Four be **DISMISSED without prejudice** to the petitioner's right to re-file it a <u>Bivens</u> action.

Furthermore, the undersigned recommends that petitioner's Request for an Evidentiary hearing be **DENIED** as moot.

**Within fourteen (14) days** after being served with a copy of this Recommendation, any party shall file with the Clerk of the Court written objections identifying those portions of the Recommendation to which objections are made, and the basis for such objections. A copy of such

objections shall also be submitted to the United States District Judge.  Failure to timely file objections to the Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation.  28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to send a copy of this Report and Recommendation to petitioner's counsel and to all counsel of record  both by email and hard copy.

DATED: August 11, 2010

DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE